UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION



| | |
|---|---|
| JOSEPH BUTLER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | CV 99-PT-3265-M |
| ) | |
| LOWE'S HOME CENTERS, INC., ) | |
| d/b/a Lowe's of Gadsden, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

This cause comes to be heard on Defendant Lowe's Home Centers, Inc.'s ("Lowe's" or "defendant") Motion for Summary Judgment, filed March 15, 2000. Joseph Butler ("Butler" or "plaintiff") asserts that Lowe's discriminated against him based on alleged race-based work assignments, disciplinary actions, wage rates, and terminations. Upon consideration of the record, the submissions of the parties, and the relevant law, it is the court's opinion that the motion is due to be granted.

**BACKGROUND**

Plaintiff is a thirty-four year old black male from Etowah County. Lowe's of Gadsden is a retail home improvement center. Lowe's employed Butler for approximately 90 days, from April 10 to July 16 of 1998, at a rate of $8.25 per hour in its delivery department. His job entailed driving a truck and delivering lumber, sheetrock, windows, and other equipment to homeowners and contractors. Claire Prosper ("Prosper") managed the Lowe's store during

1

plaintiff's employment there.

While working at Lowe's, plaintiff received three notices regarding his work performance prior to being terminated. On June 23, 1998, Butler received a verbal warning for dropping off material at the wrong job site. On that occasion, Butler unloaded a large wood beam from his truck, then discovered he was at the wrong job site, but was unable to reload the beam onto the truck. Two white workers were sent out the following day to remove the beam and transport it to the correct job site. On June 30, 1998, Butler received a verbal warning for complaining about his job assignment, delivering twenty-one pieces of 4 x 8 ½ foot sheetrock by himself. On July 14, 1998, Butler received a written warning for failing to log in his truck upon his return. It is Lowe's policy that truck drivers are to always log their trucks in and out for every load, every day. On July 16, 1998, Lowe's decided to terminate Butler based upon his poor work record and short term employment. The termination report stated:

> After reviewing Joseph [sic] file, his job performace [sic] in the last month of his 90 days he has been written up 3 times and talk [sic] to about his job performace [sic]. His job performace [sic] is not suitable for Lowe's. Action took was termination. All employee said he wasn't realy [sic] happy at Lowe's anyway and I'm getting terminated because of job performance.

In his deposition, Butler testified to his termination as follows:

> Well, what I remember is Doug and Rodney called me in the office, and they were sitting behind the desk, and I was sitting in the chair. And I was looking at them. And they said well, Joseph. And then I said did y'all call me in here to fire me. They said well. I said don't give me the long conversation. Did you call me in to fire me. They said yes. I said that's all you've got to do. I shook their hand and said have a nice day.

2

Butler Depo. at 72.[1]

Plaintiff filed his EEOC charge on December 14, 1998. Plaintiff received his right to sue letter on September 9, 1999. Plaintiff filed this action alleging disparate treatment under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §§ 1981 and 1981A on October 29, 1999.

## DISCUSSION

### A. Summary Judgment Standard

Summary judgment may be granted based upon facts developed during the administrative proceedings, the pleadings, discovery, and supplemental affidavits if together, they show that there is no genuine issue as to any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of explaining the basis of his motion. Id. The non-moving party then bears the burden of showing that there are specific facts demonstrating that there is a genuine issue of fact for trial. Id. at 324. "When deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." Korman v. HBC Florida, Inc., 182 F.3d 1291, 1293 (11th Cir. 1999). The trial court must resolve all reasonable doubts in favor of the non-moving party, but need not resolve all doubts in a similar fashion. Barnes v. Southwest Forest Indus., Inc., 814 F.2d 607, 609 (11th Cir. 1987).

---

[1] This statement certainly suggests that plaintiff was not too concerned about maintaining his employment or in seeking to justify his conduct. This attitude and approach would justify an employer not giving a further warning.

3

### B. Title VII Disparate Treatment and 42 U.S.C. § 1981[2]

Title VII of the Civil Rights Act of 1964 provides that it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (1988). A plaintiff may establish discrimination through direct or circumstantial evidence. See, e.g., Holifield v. Reno, 115 F.3d 1555, 1561 (11th Cir. 1997). Under McDonnell Douglas, to prove disparate treatment through circumstantial evidence: (1) the plaintiff must first make out a prima facie case of discrimination; (2) the burden then shifts to the defendant to produce a legitimate, nondiscriminatory reason for the adverse employment action; and (3) the burden then shifts back to the plaintiff to show that the reasons offered by the defendant are pretextual for discrimination. McDonnell Douglas Corp. v. Green 411 U.S. 792, 802-804 (1973). For plaintiff to establish a prima facie case under McDonnell Douglas, he must show: (1) he belongs to a racial minority; (2) he was subjected to adverse job action; (3) his employer treated similarly situated employees outside his classification more favorably; and (4) he was qualified to do the job. See McDonnell Douglas, 411 U.S. at 802; St. Mary's Honor Ctr. V. Hicks, 509 U.S. 502, 506 (1993); Jones v. Bessemer Carraway Med. Ctr., 137 F.3d 1306, 1310 (11th Cir. 1998); Holifield, 115 F.3d at 1562; Coutu v. Martin Cty. Bd. of Cty. Commissioners, 47 F.3d 1068, 1073 (11th Cir. 1995). It appears to the court that the only

---

[2] The allocations of burdens and elements of a prima facie case are the same for employment claims stemming from Title VII and Section 1981. Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1330 (11th Cir. 1998); Bell v. Eufala City Bd. of Educ., 995 F. Supp. 1377, 1384 (M.D. Ala. 1998). Accordingly, Plaintiff's claims under Title VII and Section 1981 will be considered together.

4

factors of the prima facie case at issue here are whether similarly situated employees outside plaintiff's classification were treated more favorably, and if not, whether plaintiff was qualified to do the job.

### 1. Work Assignments

Plaintiff alleges that Lowe's distributed work assignments in a racially discriminatory manner. In support of this argument, plaintiff cites to the following facts:

(1) Butler had to deliver a large wooden beam by himself without a forklift. When Butler accidentally delivered the beam to the wrong job site, he was disciplined, and two caucasian employees were sent in a truck with a forklift to correct his error.

(2) A caucasian driver dropped a load of banded lumber off his delivery truck, the bands broke, and the lumber became scattered at the job site. The driver left the site without straightening up the lumber. Butler was asked to go to the work site at 4:00 p.m. by himself to clean up the lumber. Butler refused. Two workers were sent out the next morning to clean up the lumber.[3]

(3) Lowe's sent Butler to deliver refrigerators to apartment complexes by himself.

(4) Lowe's sent Butler to deliver 21 pieces of 4 x 8 ½ foot sheetrock by himself.

(5) Lowe's sent Butler to deliver an 8 x 8 foot window by himself.

(6) Butler never saw or heard of caucasian employees having to complete similar

---

[3] Lowe's gives no explanation for this incident, but notes that Butler was not required to clean up the site, did not receive any disciplinary action for his refusal, and that two other employees completed the task the following day.

5

deliveries without assistance.[4]

Defendant asserts that there is no evidence that Lowe's treated Butler any differently than other Lowe's employees. Lowe's supports its assertion with the following facts:

(1) Prosper testified in her affidavit that sheetrock, refrigerators, and windows are delivered by other employees working alone without assistance. She herself has delivered loads of sheetrock alone on two different occasions.

(2) Store delivery records evidence that Billy Baker, a caucasian male, delivered 12 sheets of 4 x 8 foot sheetrock and 36 sheets of 4 x 12 foot sheetrock alone on May 28, 1998.

(3) Store delivery records evidence that Christopher Adams, a caucasian male, delivered a refrigerator alone on March 3, 1998.

(4) Store delivery records evidence that Matthew Shivers, a caucasian male, delivered an 8 x 5 foot bay window alone on May 29, 1998.

Based on this evidence, it does not appear that work assignments were distributed in a racially discriminatory manner.

### 2. Disciplinary Actions

Plaintiff asserts that he was subjected to disciplinary actions for behavior for which caucasian employees engaging in the same behavior were not subjected to disciplinary action. In support of this argument, plaintiff cites to the following facts:

(1) Despite Lowe's policy which encourages employees to "speak up" when they feel

---

[4] This is the only evidence cited by plaintiff in support of this contention. The court can find no evidence in support of his belief in the record.

6

mistreated,[5] Butler received a verbal warning for voicing his opinion that 21 pieces of sheetrock was too much for one person to deliver. Butler ultimately did deliver the sheetrock, but was chastised for "unproductive behavior, inefficiency and negligence in the performance of his assigned duties."

(2) Butler received a written warning for failing to log in his delivery truck upon return to Lowe's on his first such offense. However, a few weeks earlier, his caucasian supervisor only received a verbal warning for the same offense, by a caucasian manager. Furthermore, Butler asserts that filling out the log is not within his job description, based on Lowe's delivery policy SA-01-11 as posted on its website.[6]

(3) Butler received a verbal warning for delivering material to the wrong job site and leaving it there. But a caucasian employee who dropped a load of banded lumber at a job site and failed to pick up the lumber, leaving the lumber in disarray, did not receive a warning for his conduct.[7]

Lowe's contends that disciplinary actions are distributed to employees based solely on their work performance. In support of this argument, Lowe's cites to the following facts:

---

[5] Lowe's "no harassment" policy, policy number 103, encourages employees to speak up when they feel like they are being mistreated. Prosper stated in her deposition: "We have an open door policy, the store manager. This is regular business. I have always believed in that, that any employee that feels he is being treated different, any problems they have, they are very welcome to come speak to me about it." Prosper Depo at p. 88-89.

[6] SA-01-11 (V)(F)(4) states "Delivery Management will record all deliveries in the store's daily delivery log."

[7] The court notes that Butler's warning focused on the fact that delivery was made to the wrong job site, a point not at issue in the banded lumber incident.

(1) Terry Pentecost, a caucasian male, received a written warning for the misdelivery of stretch rock on April 5, 1999.

(2) Billy Wilder, a caucasian male, received a written warning for failing to log his delivery truck on July 14, 1998.

The facts do not tend to support a claim for disparate treatment regarding disciplinary actions.[8]

### 3. Wage Rates

Plaintiff contends that he received lower wages than other similarly situated caucasian employees. In support of this argument, plaintiff submits the following facts:

(1) Plaintiff was hired as an entry level delivery driver earning $8.25 per hour. He had a CDL license and had worked with a tractor trailer for 1 ½ months prior to joining Lowe's.

(2) Wallace Sandridge, a black male, was hired at the same entry level job as Butler during the same time period, for $8.25 per hour. Sandridge graduated from high school, and had a CDL license. He had 8 months experience with a semi-tractor and 7 months experience with a fork lift.

(3) Matthew Shivers, a caucasian male, was hired at the same entry level job as Butler during the same time period, but for $8.50 per hour. He graduated from high school, had two years of community college course work, and had a CDL license. He worked as a delivery driver for Home Quarters for approximately one year, and as a delivery driver for West Building for

---

[8] Regardless of what the company wide policy of Lowe's is concerning logging delivery trucks in and out, it seems clear that it is, at least, Lowe's of Gadsden's informal policy that drivers are responsible for logging delivery trucks in and out. Such requirements would not have to be put in a job description.

8

three months.

(4) Billy Lett, a caucasian male, was hired at the same entry level job as Butler during the same time period, but for $8.50 per hour. He had two years of high school education, but did not graduate, and had a CDL license. He worked for Osborn with a flat bed truck for approximately one year, and also as a screen printer and a door man at a bar.

Defendant contends that pay is determined by a number of factors, including prior experience. In the case of delivery drivers, those employees receiving more money had more experience. In support of its contentions, Lowe's cites to the following facts:

(1) Plaintiff had just received his commercial driving license ("CDL") and had no delivery experience prior to his employment at Lowe's.

(2) Mr. Sandridge had, like plaintiff, very little driving experience, and stated on his employment application that he expected $7.50 per hour.

(3) Mr. Shivers had driving experience at two previous jobs for West Building Materials and Home Quarters.

(4) Mr. Lett had over one year of prior driving experience.

(5) Billy Wilder and Jerry Griffin, caucasian males, were hired by Lowe's around the same time as plaintiff, into the same position, and both received $8.25 per hour.

These facts indicate that Lowe's does not base its employees' wages on their race, but rather on their relevant work experience.

### 4. Termination

Plaintiff asserts that he should have received a final warning, like white employees received, prior to his termination. In support of this assertion, plaintiff cites to the following

facts:

(1) Lowe's has the option of giving an employee a "final notice warning" before terminating the employee.

(2) Lowe's chose to not exercise this option in Butler's case.

(3) Mike Dickinson, a caucasian male, received three final warnings.[9]

(4) Plaintiff alleges that Terry Pentecost, a caucasian male, received a final warning prior to termination.[10]

(5) Billy Wilder, a caucasian male, received a final warning prior to termination.[11]

Defendant contends that, in accordance with their employment policy, a final warning is not required. In support of this, defendant refers to the following facts:

(1) Prosper testified in her affidavit that no final warning before discharge is required, especially for short term employees. Lowe's personnel practices guidelines include the

---

[9] It is unclear if Lowe's continues to employ Dickinson. However, from the dates on his warnings, including verbal, written, and final, it appears that Lowe's employed Dickinson for at least two years. Dickinson received a written warning on December 1, 1997 (angered customer); a final notice on March 10, 1998 (unexplained absence); a final notice on July 22, 1998 (disobeyed supervisor); another final notice on August 19, 1998 (changed delivery schedule without checking with management); an unidentified warning on July 12, 1999 (disobeyed supervisors); and a written warning on October 18, 1999 (unexplained absence).

[10] In plaintiff's submissions, the court finds no document which indicates that Pentecost received a final warning prior to termination. It is unclear for how long Lowe's employed Pentecost. Pentecost resigned from Lowe's on April 9, 1999. Pentecost received an unidentified warning on March 23, 1999 (angered customer); a verbal warning on March 31, 1999 (delivered materials too slow); and a written notice on April 5, 1999 (delivered wrong material).

[11] Wilder resigned from Lowe's on August 20, 1998. Wilder received a verbal warning on May 25, 1998 (broke load of glass); a written warning on July 14, 1998 (failed to log truck); a verbal warning on August 1, 1998 (late to work); and a final warning on August 19, 1998 (verbally threatened another employee).

following pertinent language:

> I. Policy Summary
>
> ...
>
> > D. These procedures are intended as guidelines and will not be interpreted as constituting any form of employment contract or obligation.
> >
> > ...
> >
> > F. Employment with the Company is at will, is not fixed in length and may be terminated at any time by the employee or by the Company at its discretion.
>
> ...
>
> V. Definitions
>
> ...
>
> Class "A" includes the most serious misconduct and repeated job performance problems. These serious violations normally will result in immediate discharge. Class "B" includes serious acts, which indicate a disregard of, established rules and/or standards of conduct but are not so serious as to compel immediate termination. Class "B" violations will normally result in a written warning for a first offense, final warning for a second offense and termination for a subsequent offense. Depending upon the severity of the infraction or past work history, termination may be appropriate for the first offense. *An employee may commit multiple Class "B" violations that are not serious when considered separately, but when group together indicate a pattern of unacceptable behavior. In such cases, management should consider multiple Class "B" violations committed in a short period of time as grounds for more serious corrective action, up to and including termination.*
> Class "C" generally results in an initial verbal warning. *However, an employee may commit multiple Class "C" violations that, when considered together, are grounds for more serious corrective action up to and including termination.*
>
> ...
>
> VI. Class A, B and C - Examples
>
> ...
>
> > B. Class "B" Violations
> > ... Depending on the severity of the violation, a final warning may be given rather than a written warning. (*While termination is normally not appropriate for a first offense, it is possible, particularly if the employee's length of service is short or their overall work record is considered less than good.*)
> >
> > ...
> >
> > 2. Uncooperative behavior.
> >
> > ...
> >
> > 8. Unproductive behavior, inefficiency and/or negligence in the performance of assigned duties.

> ...
> 11. A second Class "C" offense within a 12-month period.
> ...
> C. Class "C" Violations
> ... (As noted previously, however, *the sequence of discipline is not fixed and factors such as length of service and overall work history may be considered.*)
> 1. Failure to perform work satisfactorily.
> ...
> VII. Commendation and Corrective Action Procedures
> ...
> B. Verbal Warning
> A Verbal Warning is used when a Class "C" violation has occurred....
> C. Written Warning
> A Written Warning is used for a Class "B" violation at the time of the first offense or for repeated offenses of Class "C" violation previously addressed through a verbal counseling....
> NOTE: Although documentation of Class B & C violations is not removed from the employee's personnel file, previously documented Class B & C violations over 12 months old will normally not be considered when making corrective action decisions on current violations....
> D. Final Notice
> A Final Notice is used for repeated or multiple/severe Class "B" Violations and following a written warning for repeated Class "C" violations, which occur within twelve months....

(Emphasis added).

(2) Billy Lett, a caucasian male, was discharged without a "final warning" notice for violence in the workplace on November 5, 1998.

(3) Based on plaintiff's own statements at the time of his termination, it appears he was aware that his job was in jeopardy.

Because Lowe's was not required to give employees a final notice warning prior to termination, and because whether or not a final notice was given depended in part on an employee's length of employment with Lowe's, and considering plaintiff's short term employment with Lowe's and his work record within that short time, it does not appear to the

court that there is sufficient evidence to support a disparate treatment claim regarding final notice warnings. This is particularly true in view of the approach of plaintiff as referenced in footnote 1 above. He, in effect, invited a termination. There is no evidence that any other employee reacted similarly when summoned for an interview.

### C. Conclusion

It appears that there are no disputed facts. The facts as presented to this court do not evidence disparate treatment between plaintiff and other similarly situated caucasian employees. Furthermore, without reaching this issue, it appears that plaintiff was not well suited for his job at Lowe's. Based on the foregoing, defendant Lowe's motion for summary judgment will be granted.[12]

This ___ day of April, 2000.

/s/ Robert B. Propst
**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**

---

[12] The court has considered the census report submitted by plaintiff. However, far more than these numbers is required to demonstrate disparate impact, e.g. what percentage of relevant African-Americans have a CDL license and applied for employment with Lowe's as a delivery driver during the relevant time frame.